*E-FILED: March 23, 2012*

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JOHN BENSON, | No. C09-05772 HRL |
| Plaintiff, | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | [Re: Docket No. 31] |
| CITY OF SAN JOSE, a public entity; OFFICER BRIAN PETTIS, an individual; and DOES 1-100, inclusive, | |
| Defendants. | |

This is a civil rights action for alleged unlawful arrest and race discrimination. Defendants move for summary judgment as to all claims for relief. Plaintiff opposes the motion. Upon consideration of the moving and responding papers, as well as the arguments of counsel, the court grants the motion.

BACKGROUND

Plaintiff John Benson is an African-American male with ALS (Amyotrophic Lateral Sclerosis), commonly known as "Lou Gherig's Disease." Defendant Brian Pettis is an officer with the San Jose Police Department.

This lawsuit stems from an encounter between Benson and Pettis that occurred on December 11, 2007. On that day, plaintiff walked from his home in Almaden Valley to a bus stop on Coleman Road in San Jose. He planned to go to Oakridge Mall to do some shopping.

The bus stop, which does not have a bench or shelter, is located next to the fenced play field for Guadalupe Elementary School. The fence is approximately five feet high and includes a gate to the playing field about thirty feet from the bus stop. Benson saw children in the field as he walked to the bus stop, but says that he paid no attention to them.

Officer Pettis, who was driving by on his regular patrol, says that he saw plaintiff standing near the school yard fence. Specifically, Pettis testified that Benson was facing the field with his arms resting on the top of the fence. (North Decl. Ex. B (Pettis Depo. at 63:11-21)). According to Pettis, it was not apparent that plaintiff was waiting for the bus because Benson was not standing near the bus stop sign. In Pettis' estimation, plaintiff was standing about forty to fifty feet from the bus stop. (Id. (Pettis Depo. at 28:10-13)). Benson believes that he was standing closer to the stop. He also denies touching or leaning on the school yard fence in any way. (Benson Decl. ¶ 9). He claims that when Pettis first drove past, he (Benson) was standing with his back to the fence, facing Coleman Avenue. (Id. ¶ 10).

Pettis did not recall exactly when he told the police dispatcher that he was going to approach plaintiff. His normal procedure, however, would have been to notify dispatch before he got out of his car. (North Decl. Ex. B (Pettis Depo. at 24:4-11)). The police log of the events in question indicates that Pettis contacted dispatch at around 12:30 p.m. (Bravo Decl., Ex. A).

Pettis made a U-turn, parked his car near the bus stop, and approached Benson saying "Hey, what's going on?" or "What are you doing?" or "What are you doing here?" (North Decl., Ex. B (Pettis Depo. at 25:18-19) and Ex. C (Benson Depo. at 39:19-40:23); Benson Decl. ¶ 11). Benson pointed at the bus stop sign to indicate that he was waiting for the bus. (Benson Decl. ¶ 11). Plaintiff says that he responded affirmatively when Pettis asked if he lived in the area. (Id.). Pettis then asked to see Benson's identification. Plaintiff testified that there was nothing rude or impolite about Pettis' manner—albeit, he thought it was rude of Pettis to ask for his identification at all. (North Decl., Ex. C (Benson Depo. at 44:1-46:21)). Plaintiff says he did not believe there was any reason Pettis should have asked for his identification. Nevertheless, Benson complied without protest.

2

1  According to defendants, plaintiff opened his wallet where Pettis observed a California
2  identification card, which was visible through a plastic window. Pettis says he did not note
3  plaintiff's address, and was more interested in plaintiff's name and date of birth. Pettis denies
4  ever taking possession of Benson's identification card. (North Decl. Ex. B (Pettis Depo. at
5  29:13-30:7, 31:10-32:6)). Pettis contacted the police dispatcher for a records check using
6  Benson's name and birth date. (Bravo Decl., Ex. A; North Decl., Ex. B (Pettis Depo. at 32:22-
7  25)).

8  In Benson's version of events, Pettis instructed plaintiff to remove the card from his
9  wallet and hand it to him. Benson did so. (Benson Decl. ¶ 11). According to plaintiff, once
10 Pettis had his identification, Pettis either told him or asked him to stay where he was and held
11 on to the identification card while he made a call. (Id. ¶ 12; North Decl., Ex. C (Benson Depo.
12 at 50:10-20)). Benson did not ask, and Pettis did not say why he asked for Benson's
13 identification and requested a records check.

14 The records check came back negative for any warrants. According to Pettis' deposition
15 testimony, he received the results of the records check while he and plaintiff were standing on
16 the sidewalk. (North Decl., Ex. B (Pettis Depo. at 34:21-25)). Between the time Pettis
17 requested a background check and the time that dispatch responded with the results, Pettis says
18 that neither he nor Benson had moved anywhere and that they were still adjacent to the fence
19 where he first saw Benson reportedly leaning on it. (Id. (Pettis Depo. at 33:13-34:7)).

20 Meanwhile, a bus approached. After confirming that this was the bus Benson wanted,
21 Pettis stepped forward and flagged down the bus. (North Decl., Ex. B (Pettis Depo. at 35:15-
22 23)). At that time, Pettis says that he may have been wrapping up his communications with the
23 police dispatcher. (Id. (Pettis Depo. at 35:24-36:2)). The bus driver, Harpal Singh, testified
24 that Benson was not standing close enough to the bus stop sign to be perceived as a waiting
25 passenger. Singh says that if Pettis did not wave to him, he would not have stopped. (Id., Ex. D
26 (Singh Depo. at 63:17-64:21)).

27 Benson claims that Pettis told him to get on the bus. (Benson Decl. ¶ 14). However, in
28 deposition, plaintiff testified that nothing about Pettis' words or tone of voice suggested a

3

1  command. (North Decl., Ex. C (Benson Depo. at 56:24-57:5)). Benson boarded the bus. Pettis
2  followed him on board and asked Singh if he wouldn't mind giving "this gentleman" (meaning
3  Benson) a ride. Singh agreed. (Id., Ex. B (Pettis Depo. at 40:11-20); Ex. D (Singh Depo. at
4  32:22-33:4)). Benson remained standing at the front of the bus while he got his wallet and
5  prepared to pay the fare. (Id., Ex. B (Pettis Depo. at 41:8-25)). Believing that plaintiff did not
6  have enough money with him, Singh declined Benson's attempts to pay the bus fare. (Id., Ex. D
7  (Singh Depo. at 33:6-14)).

8  Pettis says that he did not order or instruct Benson to do anything aboard the bus. (Id.,
9  Ex. B (Pettis Depo. at 40:6-10)). Benson claims that Pettis directed him to sit down by pointing
10 to a seat. (Benson Decl. ¶ 14; North Decl., Ex. C (Benson Depo. at 58:15-25)). According to
11 Singh, after he declined plaintiff's attempts to pay the bus fare, he told Benson, "I'll give you a
12 courtesy ride, just go have a seat," and Pettis then reportedly said to Benson, "Go have a seat.
13 The driver will give you a ride." (North Decl., Ex. D (Singh Depo. at 33:15-17)). Plaintiff took
14 a seat. (Id., Ex. B (Pettis Depo. at 43:21-44:12)). Pettis remained on the bus because Singh was
15 asking him about an unrelated matter. (Id., Ex. B (Pettis Depo. at 40:21-41:1, 43:18-20; Ex. D
16 (Singh Depo. at 37:7-24)). Benson says that Pettis then returned his identification card, said
17 goodbye, told the bus driver to continue on his route, and exited the bus. (Benson Decl. ¶ 14).

18 The police log indicates that the events in question lasted about six minutes. (Bravo
19 Decl., Ex. A). As noted above, those records indicate that Pettis first contacted the dispatcher at
20 12:30 p.m. The records also contain the notation "Situation Under Control at 12/11/07
21 12:35:50." (Id.). Singh testified that Pettis was on the bus for no more than two or three
22 minutes. (North Decl., Ex. D (Singh Depo. at 44:23-24)). And, Pettis' uncontroverted
23 testimony is that, after he exited the bus and returned to his car, he typed the note "Subject was
24 leaned over the fence watching the children playing at Guadalupe." (Id., Ex. B (Pettis Depo. at
25 46:5-25)). The police log indicates that Pettis typed this note at 12:36 p.m. (Bravo Decl., Ex.
26 A). Pettis says that after typing this note, he drove away. (North Decl., Ex. B (Pettis Depo. at
27 46:23-25)).
28

4

Benson, who was upset by the whole encounter, says that it felt as if the events in question lasted more like 25 minutes from start to finish—i.e., approximately 10 minutes on the sidewalk, and another 15-20 minutes on the bus. For instance, in response to defendants' interrogatories, plaintiff stated, "My encounter with Officer Pettis *felt as if it was* 15 to 20 minutes while I was setting on the bus waiting to have my ID returned by Officer Pettis." (North Decl., Ex. F at p. 7) (emphasis added).

Benson reached Oakridge Mall as planned, but he says that he felt humiliated by the encounter with Pettis. He filed the instant lawsuit for alleged violations of his Fourth and Fourteenth Amendment rights, claiming that he was unlawfully arrested and that Pettis targeted him because of his race. He also claims that the City of San Jose (City) bears municipal liability under Monell v. Dep't of Social Servs., 436 U.S. 658 (1978) for the alleged constitutional violations. The case initially was assigned to a district judge, but eventually was reassigned to this court after all parties expressly consented that all proceedings be heard and finally adjudicated by a magistrate judge. 28 U.S.C. § 636(c); FED. R. CIV. P. 73.

Defendants move for summary judgment on all claims for relief. In essence, they contend that there was no Fourth Amendment violation because the contact between Benson and Pettis was nothing more than a consensual encounter. Additionally, they argue that there is insufficient evidence to support plaintiff's Fourteenth Amendment and Monell claims. Even assuming there was a constitutional violation, defendants contend that they are entitled to judgment based on qualified immunity. For the reasons discussed below, this court grants defendants' motion.

LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S.

5

1  317, 323 (1986). In order to meet its burden, "the moving party must either produce evidence
2  negating an essential element of the nonmoving party's claim or defense or show that the
3  nonmoving party does not have enough evidence of an essential element to carry its ultimate
4  burden of persuasion at trial." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.,
5  210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. See Nissan Fire & Marine Ins. Co., Ltd., 210 F.3d at 1102. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. See id. A genuine issue of fact is one that could reasonably be resolved in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. Anderson, 477 U.S. at 248-49.

"When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting Celotex Corp., 477 U.S. at 325). Once the moving party meets this burden, the nonmoving party may not rest upon mere allegations or denials, but must present evidence sufficient to demonstrate that there is a genuine issue for trial. Id.

## DISCUSSION

A.  Plaintiff's Fourth Amendment Claim

Defendants contend that there was no seizure under the Fourth Amendment because the contact between Benson and Pettis was a consensual encounter.

The Fourth Amendment protects individuals from unreasonable seizures of their persons. U.S. Const. Amend. IV. Nevertheless, "[t]he Fourth Amendment does not proscribe all contact between the police and citizens, but is designed 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'" Immigration & Naturalization Service v. Delgado, 466 U.S. 210, 215, 104 S. Ct. 1758, 1762, 80 L.Ed.2d 247 (1984) (quoting United States v. Martinez-Fuerte, 428 U.S. 543, 554, 96 S. Ct.

6

3074, 3081, 49 L.Ed.2d 1116 (1976)). "'Only when the officer, by means of physical force or show of authority, has restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.'" Id. (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 1879 n.16, 20 L.Ed.2d 889 (1968)). "As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." United States v. Mendenhall, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877, 64 L.Ed.2d 497 (1980).

Consensual encounters do not require reasonable suspicion that a citizen is engaged in wrongdoing, and such contacts are not considered seizures:

> Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable searches and seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen. Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means.

United States v. Drayton, 536 U.S. 194, 200-01, 122 S. Ct. 2105, 2110, 153 L.Ed.2d 242 (2002) (citations omitted).

There are no *per se* rules in the Fourth Amendment context. Instead, analysis requires consideration of the totality of circumstances surrounding the encounter. Id. at 201. The proper inquiry is whether a reasonable innocent person would feel free to decline the officers' requests or otherwise terminate the encounter. Id. at 202. No presumption of invalidity attaches if a citizen consents without explicit notification that he was free to refuse to cooperate. Id. at 207. Instead, "the totality of the circumstances must control, without giving extra weight to the absence of this kind of warning." Id.

Benson has failed to present a genuine issue of material fact that the contact with Pettis was anything more than a consensual encounter. Pettis approached, questioned, and requested identification from Benson on a public sidewalk. There is no evidence that defendant used flashing lights or that he ever used force, made threats, or touched or brandished any weapon. Plaintiff's own testimony indicates that nothing about Pettis' speech, tone, or demeanor was unreasonably authoritative or condescending. (See, e.g., North Decl.,

7

1    Ex. C (Benson Depo. at 54:19-21, 56:13-57:5, 67:24-68:5, 72:20-73:2)). Benson answered
2    Pettis' questions and readily complied with the request to see his identification. Although
3    Pettis was in uniform, that fact alone carries little or no weight. "Officers are often required
4    to wear uniforms and in many circumstances this is cause for assurance, not discomfort.
5    Much the same can be said for wearing sidearms. That most law enforcement officers are
6    armed is a fact well known to the public." Drayton, 536 U.S. at 204-05. Benson was never
7    touched or moved. He was not diverted from his planned trip to the mall. Although plaintiff
8    "felt as if" the encounter lasted more like 25 minutes (North Decl., Ex. D at p. 7), he offers no
9    evidence to support that assertion. And, the objective evidence of record indicates that the
10   events in question lasted only six minutes. (Bravo Decl., Ex. A).

11   The fact that the events in question continued on the bus does not transform the
12   consensual nature of the contact. At the time the contact occurred, Benson was waiting for
13   the bus. The bus he boarded was the one he wanted. There is no evidence that he did not
14   wish to take the bus after Pettis flagged it down, or that he wished to leave the bus once he
15   was on board. See Florida v. Bostick, 501 U.S. 429, 435-36, 111 S. Ct. 2382, 2387, 115
16   L.Ed.2d 389 (1991) (observing that while the defendant-passenger's movements were
17   confined to the bus, "this was the natural result of his decision to take the bus; it says nothing
18   about whether or not the police conduct at issue was coercive."). Benson now suggests that
19   he had no choice but to board the bus because Pettis told him to do so. (Benson Decl. ¶ 14).
20   As noted above, however, that assertion is contradicted by Benson's own deposition
21   testimony in which he confirmed that nothing about Pettis' words or tone of voice suggested a
22   command. (North Decl., Ex. C (Benson Depo. at 56:24-57:5)).

23   Benson claims that his compliance was involuntary because Pettis never explained
24   why he contacted him. But law enforcement officers may approach an individual, pose
25   questions, and ask for identification, even when they have no basis for suspecting a particular
26   individual, so long as they do not coerce the individual's cooperation. Drayton, 536 U.S. at
27   200-01, 122 S. Ct. at 2110. Plaintiff has not presented a triable issue that any coercion
28   occurred. Indeed, plaintiff explains that he believed Pettis' request was legitimate because he

8

1 respects the police. (Benson Decl. ¶ 13). Plaintiff goes on to say that had he known the
2 reason why Pettis contacted him, he (Benson) would have politely tried to terminate the
3 encounter. (Id.). In other words, Benson was aware that he was free to refuse to cooperate,
4 but he chose to comply because he respects police authority. This does not vitiate the
5 consensual nature of the contact. "'While most citizens will respond to a police request, the
6 fact that people do so, and do so without being told they are free not to respond, hardly
7 eliminates the consensual nature of the response.'" Drayton, 536 U.S. at 205 (quoting
8 Delgado, 466 U.S. at 216).

Citing United States v. Cuevas-Ceja, 58 F. Supp.2d 1175 (D. Or. 1999), Benson
argues that obedience to an officer's authority, by itself, does not establish voluntary consent.
That case, however, involved a show of force and authority that are not present here. There,
several officers boarded a bus, interrupting passengers who were preparing to leave the bus;
several officers stood guard; passengers were not informed that they could refuse to
cooperate; officers questioned each passenger (moving from the front of the bus to the rear),
while blocking the aisle to the exit; and, after an officer obtained a passenger's identification
and bus tickets, those documents were handed off to other officers. Id. at 1187-88.

Plaintiff contends that he had no choice but to comply with Pettis' requests because he
"faced the possibility of arrest and prosecution for violating California Penal Code §
148(a)(1)[1] if he did not comply with the instructions and 'requests' of Officer Pettis." (Opp.
at 8:18-20). But there is no indication that Benson was ever threatened with arrest and
prosecution for violation of that statute. Moreover, such arguments have been rejected with
respect to requests for identification. See Gilmore v. Gonzales, 435 F.3d 1125, 1137-38 (9th

---

[1] California Penal Code § 148(a)(1) provides:

> Every person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician, as defined in Division 2.5 (commencing with Section 1797) of the Health and Safety Code, in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment.

9

1 Cir. 2006) (rejecting plaintiff's argument that a "request for identification implicates the
2 Fourth Amendment because 'the government imposes a severe penalty on citizens who do not
3 comply.'").

4 Benson nevertheless maintains that he was unlawfully seized and/or arrested because
5 Pettis allegedly held on to his identification while a background check was conducted and did
6 not return the card until just before Pettis exited the bus. As discussed above, defendants
7 dispute that Pettis took or held plaintiff's identification card. Nevertheless, even assuming
8 Benson's version of events to be true, under the circumstances presented here, the court finds
9 that no reasonable jury could conclude that Pettis' retention of plaintiff's identification card
10 transformed the consensual encounter to an unlawful seizure or arrest. Benson points out that
11 "[w]hen a law enforcement official retains control of a person's identification papers, such as
12 vehicle registration documents or a driver's license, longer than necessary to ascertain that
13 everything is in order, and initiates further inquiry while holding on to the needed papers, a
14 reasonable person would not feel free to depart." United States v. Chan-Jimenez, 125 F.3d
15 1324, 1326 (9th Cir. 1997). Benson further argues that even a stop as brief as 20 seconds can
16 constitute a seizure, citing United States v. Faulkner, 450 F.3d 466 (9th Cir. 2006).

17 Both cases are readily distinguishable. In Chan-Jimenez, the contact was found to be
18 an unconstitutional seizure because, among other things, the officer (1) retained defendant's
19 driver's license and vehicle registration documents, even after determining that they were in
20 order; (2) initiated a search of defendant's truck while holding on to the needed papers; and
21 (3) kept his hand on his gun at all times—a measure that "let [defendant] know that there
22 could be adverse consequences for any failure to submit to authority." Id. at 1326. In
23 Faulkner, a seizure was found where the officer, "'by show of authority,' erected a station
24 with orange cones, a stop sign, and his official government vehicle to restrain [defendant's]
25 liberty." 450 F.3d at 470.[2]

---

[2] None of plaintiff's other cited cases compel the conclusion that a Fourth Amendment violation occurred. See United States v. Santiago-Garcia, 655 F. Supp.2d 1031 (D. Ariz. 2009) (addressing the distinction between a detention and an arrest and finding that an unconstitutional violation occurred where the officer turned off defendant's vehicle,

10

Here, by contrast, there is no evidence of any such show of force or authority. Even viewing the facts in plaintiff's favor, Pettis retained plaintiff's identification for, at most, a few minutes after Pettis received the results of the records check—during which time Pettis confirmed that an approaching bus was the one Benson wanted; Pettis flagged down the bus for plaintiff; Pettis asked Singh to give plaintiff a ride; Singh declined Benson's attempt to pay the bus fare; Benson had a seat; and Singh briefly discussed an unrelated matter with Pettis. Thus, unlike the situation in Chang-Jimenez, the totality of the circumstances presented here indicates that any delay in the return of plaintiff's identification was due, not to any effort to coerce Benson's cooperation with law enforcement, but to help him catch the very bus he wanted. Plaintiff has not presented a genuine issue of material fact whether a Fourth Amendment violation occurred when Pettis allegedly retained his identification. See, e.g., Harrison v. City of Oakland, No. C07-0921CW, 2008 WL 4914084 at *4 (N.D. Cal., Nov. 14, 2008) (finding no seizure where a citizen voluntarily complied with an officer's request to produce identification and the officer retained the identification and conducted a background check).

Based on the totality of the circumstances, as evidenced by the entire record, plaintiff has not raised a genuine issue of material fact that an unlawful seizure or arrest occurred. Defendants' summary judgment motion is granted as to plaintiff's Fourth Amendment claim.

B.   Plaintiff's Fourteenth Amendment Claim

Benson claims that his right to equal protection under the Fourteenth Amendment was violated based on the fact that he is African-American. Defendants contend that plaintiff has not presented sufficient evidence of any discrimination.

---

retained his keys and identification, and then dispersed defendant and the vehicle passengers to various locations around the vehicle for the purpose of obtaining their statements); Roy v. City of Eugene, No. 07-6290-HO, 2008 WL 4616704 (D. Or., Oct. 15, 2008) (concluding, without discussion of the pertinent facts, that an unconstitutional violation occurred); Rodriguez-Sanchez v. Besner, No. 04-0392-KI, 2005 WL 878587 (D. Or., Apr. 12, 2005) (finding triable issues as to a Fourth Amendment violation where plaintiff claimed that the defendant officer activated flashing lights on the patrol car and took plaintiff's identification to the car to call it in, leaving plaintiff "guard[ed]" by three other uniformed officers).

11

1      The Equal Protection Clause provides that no state shall "deny any person within its
2 jurisdiction the equal protection of the law." U.S. Const. Amend. XIV, § 1. "The Equal
3 Protection Clause 'is basically a direction that all persons similarly situated should be treated
4 alike.'" Loharsingh v. City & County of San Francisco, 696 F. Supp.2d 1080, 1105 (N.D.
5 Cal. 2010) (quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S. Ct.
6 3249, 87 L.Ed.2d 313 (1985)). To succeed on an equal protection claim, a plaintiff must
7 prove discriminatory intent or motive. Id.; see also Serrano v. Francis, 345 F.3d 1071, 1082
8 (9th Cir. 2003) ("To state a claim for violation of the Equal Protection Clause, a plaintiff must
9 show that the defendant acted with an intent or purpose to discriminate against him based
10 upon his membership in a protected class."). That is, a plaintiff must show that the defendant
11 "'acted in a discriminatory manner and that the discrimination was intentional.'" Bingham v.
12 City of Manhattan Beach, 341 F.3d 939, 948 (9th Cir. 2003) (quoting Reese v. Jefferson Sch.
13 Dist. No. 14J, 208 F.3d 736, 740 (9th Cir. 2000)).[3] To avoid summary judgment, a plaintiff
14 "'must provide evidence sufficient to permit a reasonable trier of fact to find by a
15 preponderance of the evidence that the [treatment] was racially motivated.'" Loharsingh, 696
16 F. Supp.2d at 1106 (quoting Serrano, 345 F.3d at 1082).

17      Benson argues that the encounter with Pettis was race-based because (1) plaintiff is
18 African-American, (2) Pettis is Caucasian; and (3) they disagree whether Pettis had a
19 legitimate reason to approach Benson and ask for his identification. Plaintiff emphasizes that
20 he was not facing the school yard and leaning on the fence, as Pettis claims. As such, Benson
21 says that Pettis is lying and that defendant therefore must have been motivated by race
22 discrimination when he approached to ask for identification. There is no evidence that
23 defendant ever made any racial remark, or that Pettis' speech, tone, or demeanor was
24 unreasonably authoritative or condescending. (See, e.g., North Decl., Ex. C (Benson Depo. at
25 54:19-21, 56:13-57:5, 67:24-68:5, 72:20-73:2)). Moreover, evidence that a plaintiff and
26 defendant are of different races/ethnicities and the fact that they disagree as to the

---

[3]  Abrogated on other grounds by Virginia v. Moore, 553 U.S. 164, 128 S. Ct. 1598, 170 L.Ed.2d 559 (2008), as recognized in Edgerly v. City & County of San Francisco, 599 F.3d 946, 956 n.14 (9th Cir. 2010).

12

1 reasonableness of defendant's conduct toward plaintiff is, by itself, insufficient to show a
2 violation of the Equal Protection Clause. Bingham, 341 F.3d at 948-49; Loharsingh, 696 F.
3 Supp.2d at 1106. That is essentially all Benson has here. The court finds that plaintiff has not
4 presented a genuine issue of material fact that Pettis unlawfully targeted him because of his
5 race.

6 Defendants' motion for summary judgment is granted as to plaintiff's Fourteenth
7 Amendment claim.

C.   Qualified Immunity

9 Having found no triable issue that any constitutional violation occurred, the court does
10 not reach defendants' arguments re qualified immunity.

D.   Plaintiff's *Monell* Claim

12 Because the court finds that no reasonable jury could find for plaintiff as to any
13 constitutional violation, his Monell claim as to the City also fails. In any event, plaintiff has
14 presented no evidence creating a triable issue that the alleged violation of his Fourth and
15 Fourteenth Amendment rights was caused by a policy or practice of the City. He points only
16 to the portion of Officer Bravo's letter (reporting the findings of his internal investigation)
17 which states that Pettis' conduct was "Within Procedure." (Bravo Decl., Ex. B). Benson
18 claims that this is an admission that the City has a policy of violating constitutional rights.
19 However, the letter conveys just the opposite message. It indicates that the City took
20 plaintiff's complaint seriously, and after investigation, concluded that there was no
21 misconduct by Pettis. Even viewing the evidence in the light most favorable to plaintiff, no
22 reasonable juror could conclude that the letter, in the context in which it was issued, is an
23 admission that the City has a policy of ignoring or condoning alleged illegal conduct of its
24 officers generally and of Pettis specifically.

25 Defendants' motion for summary judgment is granted as to this claim.

ORDER

27 Based on the foregoing, defendants' motion for summary judgment is granted. The

13

clerk shall enter judgment for defendants and close the file.

SO ORDERED.

Dated: March 23, 2012

_____
HOWARD R. LLOYD
UNITED STATES MAGISTRATE JUDGE

5:09-cv-05772-HRL Notice has been electronically mailed to:

Allen Ruby     Allen.Ruby@Skadden.com, marilyn.garibaldi@skadden.com

Richard D. North     cao.main@sanjoseca.gov, richard.north@sanjoseca.gov

Counsel are responsible for distributing copies of this document to co-counsel who have not registered for e-filing under the court's CM/ECF program.